HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
GRIFFIN ESTES. CA Bar # 322095
Assistant Federal Defender
Office of the Federal Defender
2300 Tulare Street, Suite 330
Fresno, CA  93721-2226
Telephone: (559) 487-5561
Fax: (559) 487-5950

Attorneys for Defendant
ANTHONY WOLFF

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ANTHONY WOLFF,<br><br>Defendant. | Case No. 1:24-cr-00226-DAD<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>Date:  April 6, 2026<br>Time:  10:00 a.m.<br>Judge: Dale A. Drozd |

## I.      INTRODUCTION

Defendant Anthony Wolff stands before this Court for sentencing on his first and only criminal conviction. The conviction arises out of an undercover operation in which a Homeland Security Investigations ("HSI") agent posed as a mother of a seven-year-old child on a dark-web forum. Mr. Wolff, who began communicating with the agent through the forum and eventually through online chat services, sent her child sexual abuse material and expressed a desire and attempted to entice the agent and her daughter. Mr. Wolff was living in Arizona at the time of the offense. He never traveled to meet the agent whom he believed lived in California. After monitoring the defendant for some time, agents executed a warrant at his home where he was arrested. Mr. Wolff's conduct is a product of a series of mood and personality disorders that led to this disquieting set of circumstances. To his credit, Mr. Wolff recognizes this, and has been addressing head-on the underlying causes of his disorder. Moreover, Mr. Wolff realizes the

severity of his offense and is deeply ashamed of his conduct. In light of all the factors under 18 U.S.C. § 3553(a), Mr. Wolff respectfully requests that the Court impose a sentence of 120 months, to be followed by 120 months of supervised release.

## II.    BACKGROUND

Mr. Wolff's life, at first glance, reflects many of the outward markers of normalcy. He was raised in a small, insular community in a household that, by all external appearances, was stable and intact. But the outward appearance on paper does not always translate to connection in practice. Mr. Wolff, from an early age, experienced himself as different—separate from his peers, unsure of how to belong, and chronically alone. PSR, ¶¶ 65-66. As a child, he struggled profoundly to form friendships. He recalls long stretches of isolation and the painful awareness that social interaction seemed to come naturally to others but not to him. He was placed in special education throughout his schooling, reinforcing his sense of being set apart. PSR, ¶ 83. Even within his own family, his emotional world appears to have been solitary. Now in his forties, he can still vividly recount the one time he played with his father—memories that endure precisely because they were so infrequent. PSR, ¶ 65. Those sparse recollections underscore a childhood marked less by warmth and engagement than by distance. He saw a speech pathologist. PSR, ¶ 66. He was in special education – again separated from others. *Id*.

By adolescence and adulthood, that isolation hardened into chronic depression, punctuated by episodes of suicidal ideation. PSR, ¶¶ 78-80. Mr. Wolff describes a life largely devoid of deep or sustaining social bonds. Though Mr. Wolff does report having some friends, PSR, ¶ 67, the longs bouts of depression that have plagued him since elementary school are a testament to Mr. Wollf's siloed existence. Although he had a child, and was engaged to be married, Mr. Wolff does not have a stable relationship with them either. PSR, ¶¶ 35, 71.

Notwithstanding Mr. Wolff's learning difficulties and emotional challenges, Mr. Wolff was gainfully employed for nearly two decades in the field of fire alarms. PSR, ¶ 88-94. Mr. Wolff strived to have a 'normal' life. He obtained a certification in the fire alarm field. PSR, ¶ 85. He had purchased a house, and started a family. Nonetheless, Mr. Wolff continued to experience himself as different, and continued to struggle with depression.

Wolff – Sentencing Memorandum                    2

It is in that context—not as an excuse, but as an explanation—that he gravitated toward the darkest corners of the internet. PSR, ¶ 7. There, behind a screen, he encountered what felt like connection, excitement, and belonging. For someone who had long felt invisible and socially adrift, those interactions filled a psychological void he never learned to address in healthy ways.

Importantly, Mr. Wolff's conduct reflects not predatory calculation but emotional immaturity and profound social dysfunction. He was given opportunities to engage in in-person misconduct and did not do so. PSR, ¶ 24. At times, he withdrew from the online conduct itself – going nine months without communicating with the undercover agent. PSR, ¶ 13-16. His behavior demonstrated a striking lack of criminal sophistication—most notably, sending photographs and videos of himself to an undercover government agent, PSR, ¶ 11, and displaying his real name online. PSR, ¶ 15. Such actions are inconsistent with the methodical caution typically associated with hands-on offenders and instead reveal impulsivity, poor judgment, and a limited capacity to foresee consequences.

None of this diminishes the seriousness of the offense. The harm inherent in child exploitation is real and lasting. Mr. Wolff now confronts that reality with a depth of remorse that did not exist at the time of his conduct. PSR, ¶ 34. Since his arrest, he has begun to examine not only what he did, but why he did it. *Id.*  He recognizes that his actions contributed to an ecosystem that harms children and that his behavior inflicted pain not only on victims but also on his own family, who must now live with the consequences of his choices.

Mr. Wolff's history reveals a man who is socially stunted, chronically depressed, and deeply isolated. His conduct was serious, but it arose from maladaptive attempts to fill longstanding emotional deficits rather than from calculated predation.

With appropriate structure, treatment, and supervision, Mr. Wolff presents as someone capable of rehabilitation. Indeed, Mr. Wolff has shown a motivation to engage in rehabilitative efforts. PSR, ¶ 4-5. His lack of prior real-world offending, his withdrawal at times from the conduct, his absence of sophistication, and his post-arrest insight all suggest a man who is amenable to intervention.

Wolff – Sentencing Memorandum                3

### III.    ARGUMENT

A sentence that balances accountability with meaningful treatment will better serve both public safety and the interests of justice than one focused solely on punishment. As will be argued below, a sentence of 10 years in prison, followed by 10 additional years of supervised release is a reasonable sentence under the circumstances.

**A.  Mr. Wolff's Internal Struggles.**

Mr. Wolff relationship to his father is an example of his inability to establish meaningful healthy interpersonal relationships. For instance, he recalls fondly the experience of playing with his father "once" as a child. PSR, ¶ 65. However, he also recalls that his father kept to himself. *Id*. He also felt as though his father was "disinterested" in him. *Id*. Yet, Mr. Wolff experienced a major episode of depression after his death. PSR, ¶ 77.  It can hardly be said that his relationship to his father was characterized by any special fondness. Indeed, Mr. Wolff continues to have a difficult time speaking about some aspects of his childhood. PSR, ¶ 70 ("When asked about any history of suffering abuse, Wolff became extremely emotional.") Hence, the depressive episode after his death is emblematic of a deeper flaw in Mr. Wolff's emotional regulation.

His emotional issues came to a climax in 2016 when "Wolff attempted to die by suicide […] and as a result was hospitalized for several days." PSR, ¶ 78. Mr. Wolff was later proscribed with a variety of medications to treat his mental health disorders and hormonal imbalances. PSR, ¶ 79. Mr. Wolff struggled to deal with the experience of being different than others.

Yet, Mr. Wolff's depressive attributes and emotional dysregulation was always present. Mr. Wolff did not self-medicate, nor drown his feelings. PSR, ¶ 82. Unfortunately, he sought his emotional outlet in the world of online pornography. He fell further and further into the dark world of online chat rooms and content. PSR, ¶ 7. Without a doubt, the things he said and images he shared in those chat rooms are inexcusable. Mr. Wolff recognizes that today and he is "ashamed of [his] conduct." PSR, ¶ 34.

**B.     A 120-Month Sentence Accounts for the Aberrant Nature of the Offense.**

A sentence of 120 months of imprisonment—a decade of incarceration—adequately accounts for the gravity of the offense, something Mr. Wolff does not dispute, while still

recognizing that Mr. Wolff conduct here is a serious departure from how he has otherwise lived his life. Thankfully, Mr. Wolff's conduct remained purely online. He never traveled in furtherance of his offense – he didn't buy gifts nor make any attempts to directly contact the undercover agent's purported daughter. Although his conduct is serious, the lack of any actions taken in the physical world distinguishes this case from more aggravated offenses.

Crimes committed in online environments can foster a significant degree of psychological distancing that is not present in face-to-face conduct. The anonymity, lack of immediate interpersonal feedback, and mediated nature of digital interaction reduce empathic engagement and obscure the real-world harm suffered by victims.  Within this framework, repeated exposure to online material can lead to a gradual progression toward more extreme content. What may begin as passive or curiosity-driven viewing can, over time, evolve into compulsive and increasingly deviant conduct as the individual becomes desensitized and seeks stronger stimuli. *See* Victor Cline, *Pornography's Effects on Adults and Children*, in *Pornography: Research Advances and Policy Considerations* 147, 157–59 (1986) (describing stages of addiction, including escalation and desensitization). While this progression does not excuse the conduct, it provides important context for understanding how an individual with underlying mental health vulnerabilities may come to engage in increasingly serious online offenses. Major depressive symptoms are associated with social isolation, diminished impulse control, impaired decision-making, and a tendency toward compulsive or escapist behaviors, particularly in online settings. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) (DSM-5), p. 178-180, 796. And as is well documented, Mr. Wolff has long suffered from depression, which likely caused him to seek out content to counteract his emotional distress. To his credit, Mr. Wolff is coming to understand how this dynamic contributed to his offense conduct. *Attachment A – Letter of Rod Githens*. Moreover, he has begun to take medication addressing his depression. *Id*. And, lastly he has committed to rehabilitating – actively taking steps towards that goal while in pretrial custody. PSR, ¶ 34. All these are important steps to make sure that Mr. Wolff does not reoffend.

This is Mr. Wolff's first and only offense. Thus, a 10-year prison sentence for him will

leave a significant impression and will sufficiently deter him. Federal courts have granted variances after considering that the defendant has not previously served time in prison. *See United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) (affirming non-guideline sentence, justified in part by judge's finding that prison would mean more to this defendant than one who has been imprisoned before, which resonated with goal of "just punishment" in section 3553(a)(2)(A) and "adequate deterrence" in section 3553(a)(2)(B).)

**C.      A 120-Month Sentence Accounts for the Need to Avoid Unwarranted Sentence Disparities.**

Although a district court must begin a sentencing hearing by "correctly calculating the applicable Guidelines range," a Guidelines sentence is neither mandatory nor presumptively reasonable. *Gall v. United States*, 552 U.S. 38, 46, 49-50 (2007). Indeed, a district court is empowered to give a below-Guidelines sentence based on nothing more than a policy disagreement with the Guidelines. *Kimbrough v. United States*, 552 U.S. 85, 110 (2007*); accord United States v. Henderson*, 649 F.3d 955, 963 (9th Cir. 2011). Judges have routinely exercised their discretion to vary below the advisory guideline range in 18 U.S.C. § 2422(b) cases.

Indeed, In the last five fiscal years, there have been 89 defendants whose primary guideline was §2G1.3 and who faced an advisory guideline range of 168 to 210 months based on a total adjusted offense level of 35 and a criminal history category I. *See* USSC, JSIN, https://jsin.ussc.gov/analytics/saw.dll?Dashboard. Under these circumstances – in cases with the same Guidelines as Mr. Wolff's – judges have granted downward departures or variances in 64% of cases, with a median sentence of 135 months. *Id.*   Thus, a sentence of 120 months is within the range of comparable sentences.

One of those 89 cases in particular warrants closer consideration: *United States v. Macapagal*, 56 F.4th 742 (9th Cir. 2022). Like Mr. Wolff, Mr. Macapagal came to law enforcement's attention during an undercover operation in which a Federal Bureau of Investigation ("FBI") agent posed as the mother of three minor daughters on a dating website for adults. *Macapagal*, 56 F.4th at 744. The undercover agent responded to Mr. Macapagal's profile and explained that she wanted her three daughters, who she claimed were aged 6, 9, and 11, "to

Wolff – Sentencing Memorandum                                6

learn about sex in safe environment." *Id.* Through telephone conversations and text messages, Mr. Macapagal and the agent planned a meeting during which Mr. Macapagal would be introduced to the undercover agent's daughters. *Id.* at 744-45. "[Mr.] Macapagal showed up for the meeting with gift bags, condoms, and vibrators, and he was immediately arrested." *Id.* at 745. Following a jury trial, he was convicted of one count of 18 U.S.C. § 2422(b). At sentencing, the district judge determined that a total adjusted offense level 38 applied. *See* Amended Order at 10, *United States v. Macapagal*, Case No. 19-0080 LEK (D. Haw. Sept. 7, 2021), ECF #159. As Mr. Macapagal had no prior criminal history, he was in a criminal history category I, resulting in an advisory guideline range of 235 to 293 months. The judge ultimately varied down to 121 months of imprisonment, based on both policy disagreements with §2G1.3 and Mr. Macapagal's mitigating circumstances, including his strong family support and lack of criminal record. *Id.* at 10-12; *see also Macapagal*, 56 F.4th at 745.

Although involving a slightly different statutory provision, *United States v. Wintersteen*, Case No. 5:09-cr-00359-F-1, is also instructive. According to the criminal complaint, Mr. Wintersteen corresponded via Yahoo Instant Messenger with a cooperating witness, who claimed to have an eight-year-old daughter. Criminal Complaint at 2, *United States v. Wintersteen*, Case No. 5:09-cr-00359-F (W.D. Okla. Nov. 9, 2009), ECF #1. During their chats, Mr. Wintersteen— who resided in Mammoth Lakes, California—proposed visiting Oklahoma, where the cooperating witness claimed to live, for the purpose of having sex with the cooperating witness and her daughter. *Id.* at 3-4. In a series of explicit messages, Mr. Wintersteen referenced committing a violent act against the daughter and his desire to watch the daughter engage in bestiality. *Id.* at 4. Mr. Wintersteen was ultimately arrested when he arrived in Oklahoma City a few weeks after he first began corresponding with the cooperating witness. *Id.* at 6. In his luggage, law enforcement officers found "a new stuffed animal for the girl; three different types of erection drugs; a Santa Claus hat; a camera; and a laptop computer containing child pornography, adult-animal bestiality, and even animal-child bestiality." United States' Response to Defendant's Sentencing Memorandum at 1, *United States v. Wintersteen*, Case No. 5:09-cr-00359-F-1 (W.D. Okla. Aug. 17, 2010), ECF #56. At his subsequent trial, the jury returned

guilty verdicts for a violation of 18 U.S.C. § 2423(b), interstate travel with intent to engage in illicit sexual conduct with a minor, and 18 U.S.C. § 2252A(a)(5)(B), possession of child pornography. At sentencing, the district court imposed a sentence of 131 months of imprisonment. Judgment, *United States v. Wintersteen*, Case No. 5:09-cr-00359-F-1 (W.D. Okla. Nov. 5, 2010), ECF # 63.

Unlike Wintersteen and Macapagal, Mr. Wolff's offense did not involve any real world conduct. As such, an 168-month sentence would result in a disparity given sentences imposed in cases similar to Mr. Wolff's where the conduct of the defendants is more aggravated because it involved travel and real world preparation to commit the offense. However, a sentence of 120 months represents an appropriate downward variance considering the nature of the conduct and Mr. Wolff's personal history and characteristics – especially Mr. Wolff's rehabilitative efforts.

**D.     A 120-Month Sentence Best Serves the Need to Provide Mr. Wolff with Needed Correctional Treatment.**

During the presentence interview, Mr. Wolff readily admitted that he needs treatment. More importantly, Mr. Wolff has made genuine efforts to address the underlying issues and thought processes went into his rationalization of the offense conduct. In particular, Mr. Wolff has taken a large number of courses aimed at addressing the underlying issues that caused the offense conduct. PSR, ¶ 4-5; *See also Attachment B – Edovo Transcript*. Mr. Wolff's time in custody has also been remarkably oriented towards rehabilitation. He's shown real initiative. He was one of the founding members a group of men suffering from the same behavioral issues. *See Attachment A - Letter of Rod Githens and Thomas Lopez*. The fact that he's taken these active steps towards understanding the causes and consequences of his actions speaks to his likely of successful adjustment to supervision. At his core, Mr. Wolff is open to guidance and reform.

The reality is that Mr. Wolff will receive little in the way of treatment while at the BOP. According to the BOP's website, a sex offender will receive treatment only for his or her final three years of incarceration, meaning a longer term of imprisonment does not equate to more in-prison treatment. *See* BOP, *Sex Offenders*, https://www.bop.gov/inmates/ custody_and_care/sex_offenders.jsp (last visited March 17, 2026). Indeed, the BOP's residential

sex offender treatment program—offered at only two facilities nationwide—is only twelve to eighteen months long. *Id.* The nonresidential program is just nine to twelve months long. *Id.* A longer prison sentence will not give Mr. Wolff access to more treatment in prison. The BOP's limited resources for sex offenders underscores the need for community-based treatment for individuals like Mr. Wolff. A 120-month sentence will allow Mr. Wolff to participate in the limited programming offered through the BOP and then take advantage of the more comprehensive community-based treatment resources following his completion of his sentence.

**E.      The Court Should Enter a Money Judgment of $5,000.**

As part of the plea agreement, Mr. Wolff agreed to pay "a money judgment for a reasonable amount for any property that he no longer owns." ECF Dckt. # 32, p. 5. "If the parties cannot agree on what constitutes a reasonable amount, they will submit the matter to the court for its decision." *Id*.  The parties have been in discussion regarding what constitutes a reasonable amount for the money judgement in this case. Until now, the parties have been unable to come to an agreement. Mr. Wolff is proposing that the Court enter a money judgement of $5,000.

Regarding the assets mentioned in the plea agreement: Mr. Wolff did not own the 2022 Jeep Grand Cherokee – that car was re-possessed after Mr. Wolff was unable to make payments on the lease he had for it. As for the residence, Mr. Wolff, with the assistance of his sister, sold his home, and used the income from that transaction to pay a lawyer who represented Mr. Wolff in this matter, but who has since withdrawn from the representation. Undersigned counsel has provided supporting documents to the government that show that Mr. Wolff made $53,595.84 from the sale of his home. Furthermore, Mr. Wolff has also provided documentation to the government that Mr. Wolff paid his prior counsel for approximately an identical amount of money. At the time that Mr. Wolff sold his residence to use the proceeds to hire a lawyer, he was unaware the government would be seeking a sum of money related to the sale of his house. As it stands today, Mr. Wolff is suggesting that the Court impose a money judgement of roughly half his current net worth, or $5,000. His net worth consists primarily of a retirement account.

//

#### IV.    CONCLUSION

In closing, Mr. Wolff is highly motivated to continue on his journey of rehabilitation. He looks forward to learning of his son's accomplishments while he's in custody, and he hopes to be able to watch his graduate high school. He recognizes how his conduct has harmed his son in a myriad of ways.  Up until now, he was a dedicated father, and he hopes to be able to make amends to his son, and society at large.

For the reasons set forth above, the defense respectfully requests that the Court impose a sentence of 120 months of imprisonment, to be followed by 120 months of supervised release. Mr. Wolff is requesting that the Court recommend imprisonment at the Federal Correctional Institution, in Englewood – Colorado.

Respectfully submitted,

HEATHER E. WILLIAMS
Federal Defender

Date: March 30, 2026                    /s/ Griffin Estes
                                        GRIFFIN ESTES
                                        Assistant Federal Defender
                                        Attorney for Defendant
                                        ANTHONY WOLFF

Wolff – Sentencing Memorandum                    10